## WELLS, EXECUTOR, &C., vs. BRANSFORD.

[APPLICATION FOR PROBATE OF WILL OF MARRIED WOMAN.]

1. *Wife's right to dispose by will of her separate estate.*—Where there is an agreement between husband and wife, before marriage, that she shall have either the whole or a particular part of her personal property to her separate use, she may dispose of it by will, without the consent of her husband.

2. *Ante-nuptial agreement established on secondary evidence.*—In this case, the probate of the wife's will being resisted by the husband, the execution of an ante-nuptial agreement between them was established on the testimony of two witnesses, who had often seen and read it, in connection with evidence of the husband's subsequent declaration that he had burned it; although there was evidence of the wife's declarations, to several persons, that there never was any marriage contract between her and her husband; and although the witnesses who testified to its existence could not recollect the language of it, and did not agree as to its precise terms.

3. *Presumption contra spoliatorem.*—A husband, in resisting the probate of his wife's will, can derive no advantage from any obscurity or uncertainty in the secondary evidence adduced of the contents of an ante-nuptial agreement between him and his wife, when the paper produced by him, on notice, is materially different from that to which the witnesses depose, and there is evidence of his declaration that he had burned the marriage contract. The maxim, *omnia presumuntur contra spoliatorem*, applies with full force against him.

4. *Party's answers to interrogatories, admissibility of.*—A party's answers to interrogatories, under the statute in aid of discoveries in common-law suits, if his adversary declines to read them, cannot be considered by the court as evidence for him for any purpose.

5. *Remandment of cause on reversal of decree.*—On the reversal of a decree of the probate court, disallowing the probate of a will, the cause having been heard before the judge without the intervention of a jury, although the appellate court might (Code, § 3034) render the decree which the probate court ought to have rendered, the safer practice is to remand the cause.

APPEAL from the Court of Probate of Madison.

IN THE MATTER of the last will and testament of Mrs. Elizabeth H. Bransford, which was propounded for probate by the appellant, and contested by the appellee, her husband; and which gave certain slaves, eight in number, to Martha W. Pritchett and Elizabeth H. Vanhook, who were the neices of said testatrix. The proponent alleged, in his application for probate, that said testatrix, at the time of her death, was the wife of Abram Bransford, the appellee, but that her will, notwithstanding her coverture, was valid, and ought to be admitted to probate, because, 1st, "her said husband consented and agreed that she might make said will"; 2dly, "she had and held, in the negroes so disposed of by said will, a separate estate, to her sole and separate use"; 3dly, "the marital rights of her said husband never attached to said negroes, because, prior to her marriage with him, she and he executed a written agreement, whereby he relinquished all right to said negroes which he might or could acquire by said marriage, and she reserved to herself a separate and exclusive estate in them; which said deed of marriage settlement is now in the possession of her said husband, unless he has destroyed it, and he is hereby notified to produce it on the hearing hereof"; and, 4thly, "it was distinctly agreed and understood between them, prior to said marriage, that a deed should be executed, on the marriage, securing to her a separate estate in all the property she then possessed,—that such a deed was actually written out and prepared, and handed to him for execution, which he promised to do, and then fraudulently procured said marriage to be had without executing it." The probate was contested on the following grounds: 1st, "that said paper was not executed by said Elizabeth as and for her last will and testament"; 2d, "that said paper, if executed by said Elizabeth as and for her last will and testament, was made without the knowledge, consent, or concurrence of this defendant, her husband"; 3d,

14

" that said Elizabeth, at the time said will purports to have been made, and at the time of her death, was a married woman"; and, 4th, " that said paper was obtained by fraud and undue influence, exercised over the said Elizabeth by said Martha W. Pritchett and Elizabeth H. Vanhook."

The cause was submitted to the probate judge, without the intervention of a jury; several exceptions being reserved to his rulings, and embodied in a bill of exceptions, from which the following facts appear :

The execution of the will was proved by two of the subscribing witnesses, and the death of the third was shown. These two witnesses further testified that, at the time the will was executed, Mrs. Bransford requested them to keep it a secret from her husband, alleging that she apprehended unkind treatment from him and his family if it were known. " The proponent then introduced John H. Hurt as a witness, who testified, that he lived near Abram Bransford at the time Mrs. Bransford died; that he was in her company often during the last few days of her life, and saw no evidence of feebleness of mind; that she told him of the will, and made the same request of him as to keeping it secret; that he told her he thought her husband ought to know it, and, about ten days before her death, told him of it, and he denied her right to make a will. In one of his visits, a few days before her death, witness heard a conversation between said Bransford and his wife, in which she said, ' I understand you have given Mr. Holding a deed of trust on my negroes, and I want to know if it is so.' Mr. Bransford exhibited a good deal of feeling and irritation, and replied, ' It is a lie, and I want to know who told you so.' She gave him the name of her informant, and he repeated that it was false. Witness further stated, that Mrs. Bransford was an old girl when she married Bransford, and was the sister of John C. Ayres, who lived in Madison county, and who died in October, 1837; that said Ayres resided in Triana when he died, and his plantation was three miles off; that Peter J. Hurt became the administrator on the estate of said Ayres, which position he occupied for several years; that his widow, Elizabeth A., then married a gentleman by the name of Holman, who became the administrator, and removed to South Ala-

bama; that Holman lived but a short time, and his widow then married a man by the name of Lowry; that the widow became administratrix herself after the death of Holman; that Holman, when he removed to South Alabama, appointed Bransford his agent, and left in his possession a portion of the old papers of said John C. Ayres, a box full of which he took to his own house; that the widow, shortly after the death of Holman, or before, removed to South Alabama, and left the Ayres plantation under the control of witness, who has in his possession the old Ayres papers left on the place, and also the box of papers taken off by said Bransford, which, after the death of his wife, and when he was about to break up house-keeping, he returned to the plantation. Witness further testified, that said deceased never had any children; that said Martha W. Pritchett and Elizabeth H. Vanhook were her neices, and were in necessitous circumstances; that all her other near relations were independent; that Bransford came to his house, two or three days after the death of his wife, and commenced a conversation in regard to her will, in which he denied that she had any right to make one; that witness told him he must be mistaken,—that Peter Hurt had told witness that there was a marriage contract; that said Bransford replied, 'No, there is none'; that witness then said, 'You had better be cautious, for I am of opinion that I now have it among John C. Ayres' old papers'; to which said Bransford replied, 'No you haven't, for I burnt it.' It was further proved that a thorough search had been made, among all said papers, for such a contract, at the instance of said Vanhook, but without success."

The proponent then read the deposition of Peter T. Hurt, who testified, that he knew Mr. and Mrs. Bransford, but did not recollect when they were married, or whether he was present at their marriage; that "the said Elizabeth owned some negro property, prior to her marriage, but he does not know how much, and does not know what has been the increase of it"; that "there was a marriage contract between the said Elizabeth and Abram Bransford," and witness "saw said contract, several years after the marriage, among the papers of John C. Ayres"; "that said contract was in writing, and was signed by said Elizabeth and Abram Brans-

ford"; that "his best recollection is that said contract related to the negro property of said Elizabeth, and reserved the right and title of said property to her, and said Bransford gave up whatever title he might have in said property as the husband of said Elizabeth"; that said contract, when witness last saw it, was in Madison county, among the papers of John C. Ayres, but he does not know where it now is; that "his best recollection is that said contract reserved said property to the sole and separate use of said Elizabeth." · This witness further testified, in answer to the cross-interrogatories, "that he never saw said contract before· said marriage,—did not see it signed, don't recollect to have ever· heard said Abram say any thing about said contract, don't know that said contract was made before marriage,—derived his information from the written contract which he found among the papers of said Ayres"; "that he first saw said contract in 1837 or 1838, in the county of Madison, at the house of said Ayres,—saw it there more than once—does not recollect how often, but a great many times,—read it, but does not know how often"; "that the name 'Abram Bransford' was signed to said contract,—did not see him sign his name, but believes it to have been his signature from his (witness') knowledge of his handwriting,—has seen him write frequently, and knows his signature,—has seen him write at his own home, Huntsville, and at many other places, but does not recollect how often,—has seen him write letters and promissory notes"; that he "cannot recollect the words of said contract, and does not recollect positively whether or not the words 'sole and separate' were used in it"; that he "has a distinct recollection of the provisions of said contract, though he does not recollect the words"; that he "does not know whether said contract embraced all the negroes or not, but his best recollection is that it embraced all"; that "the names of Abram Bransford and Elizabeth Bransford were signed to said contract, and witness believes it to have been written by Abram Bransford,—does not know that it was written by said Abram, but believes it was from the fact that it resembled his handwriting"; that "he cannot state the contents of the writing more fully than he has already done"; that " the said negroes lived with said Abram and Elizabeth Bransford after their marriage."

The proponent then read the deposition of Mrs. Elizabeth A. Lowry, who testified, that Abram and Elizabeth Bransford were married at her house, and in her presence; that Mrs. Bransford, at the time of her marriage, owned several negroes, the names of which she cannot recollect; that there was a marriage contract between them, prior to their marriage, in relation to these negroes. "It was written. I can't say positively whether it was signed or not, but to the best of my recollection it was signed by Elizabeth Ayres and Abram Bransford. The contract related to a girl, named Louisa. That girl was given to Elizabeth Ayres, to dispose of as she wished. If it related to any other property, I don't recollect it. I last saw it (said contract) at my house, in Madison county, but cannot tell where it now is. The girl Louisa was secured to the separate use of the said Elizabeth. I saw the instrument, and recognized it to be in the handwriting of Abram Bransford, knowing his handwriting well. From the best recollection I have of the instrument, the one shown to me as a copy is not the same that I saw; for the girl Louisa, in the instrument I saw, was secured to the separate use of Elizabeth Ayres." [*Cross-examined.*] "I saw the contract before they were married. I did not see it signed, nor did I hear said Abram say that such contract was made before marriage. I know the contract was made before marriage, because I saw it, and heard it read. I saw it at my house several times, and heard it read once. I did not see him [Abram Bransford] write it [his signature], but knew his handwriting. I have seen him write, at various times, at his own, and at my house, and have often received letters from him. I cannot [give the language of said contract, or say that the words 'sole and separate use of the said Elizabeth' were used in it, or say what its precise provisions were.] I have no positive recollection of the language of the contract; but the purport of it was to give Elizabeth Ayres the negro Louisa. I only recollect that the negro Louisa was mentioned. I cannot [say that said contract used the language, 'her own individual property, free from the rights of her husband', or 'a separate right in said slaves, free of the contracts of Abram Bransford'.] Abram Bransford had possession of all her [his wife's] negroes, after they were married."

[*Re-examined.*] "I cannot state the contents of the agreement, in full; but I know that, in the instrument I saw, the girl Louisa was given to Elizabeth Ayres."

"John H. Hurt also testified that, at the request of said Abram Bransford, since this litigation has been pending, he looked over the old papers of said John C. Ayres, and furnished defendant with specimens of said Ayres' handwriting, giving him such old papers as he supposed to be in his handwriting.

"The defendant proved, by the plaintiff's witnesses, on cross-examination, that they never saw any unkind treatment of the deceased by the said Abram; and, by some of them, that they were intimate in the family, and that the best state of feeling seemed to exist between them. The defendant also read the deposition of Peter T. Hurt, taken as upon cross-examination," who testified as follows: "I was administrator of John C. Ayres, and took charge of his papers. I found among the papers the marriage contract spoken of in my former deposition; but I do not know how it came among them, or who deposited it there. I am acquainted with the handwriting of said Ayres; I lived with him for several years, and have often seen him write. I can't say that said contract did [have any writing on the back of it], or did not; I don't now recollect. I think I could identify the contract I saw among said papers, if shown to me. I have examined the paper marked 'Exhibit A'; and, from my knowledge of the handwriting of said Ayres, I believe the endorsement thereon, 'E. H. Ayres with John C. Ayres', to be his handwriting. I do not think the paper here shown me, marked 'Exhibit A', is the one I saw among the papers of said Ayres; it is, to the best of my knowledge, in the handwriting of Abram Bransford. I don't think it is exactly, in substance, the same I saw among the papers of said Ayres. My best recollection is, that the contract I saw among the papers of said Ayres was signed by Elizabeth Ayres (not Bransford) and Abram Bransford; but in this I may be mistaken. I think it mentioned the names of negroes; but what names, and to what extent, I do not recollect. I am not [prepared to say positively that said contract secured to Elizabeth Bransford's separate use, absolutely and unconditionally, all the negroes she had previous to her marriage.]"

" Exhibit A", referred to by this witness, is a writing signed by Abram Bransford, endorsed " E. H. Ayres with John C. Ayres", and in the following words :  " Whereas, it is expected that Elizabeth H. Ayres and Abram Bransford will be married in the course of a few days, and she, the said Elizabeth, being desirous of making some provision of the negroes that she now owns, as follows :  Provided it should be so ordered by Providence that she, the said Elizabeth, should have children, the said negroes is to go to them; and if the said negroes should overgo an equal proportion with my children, then shall no deduction be made off them; though it is to be understood that they shall be put on equal footing with my other children, provided the above negroes should fall short, by death or some other disaster.   Given under my hand, this, the 27th day of June, 1832."

" The defendant then introduced as a witness Mrs. Elizabeth Collier, who testified, that the deceased, some time in July prior to her death, came to her house, in company with two neices, the legatees mentioned in her will, and requested witness to send to Triana for Dr. Debow, M. A. Lewis and James S. Lewis, who were the attesting witnesses of the will propounded for probate,—that she wanted to make a will. Witness asked her, if her husband would be there; she said, ' No, that she did not want him to know it,—that she was going to make a will without his knowledge or consent. Witness went out, to call a servant to send; and when she returned, the deceased informed her, that she need not send, —that she would postpone making it.   The deceased told witness, on that occasion, that her husband was unkind to her, and, if he should know of her making a will, would treat her with greater unkindness; but witness, who had visited in the family, never saw any unkindness.   The deceased also enjoined secrecy on her; and said to her, in this conversation, that there was no marriage contract between her and her husband,—that there was a writing, but it did not amount to a marriage contract.   There was no evidence as to what the deceased considered a marriage contract.   This witness further stated, that said deceased, within a few years after her marriage with said Bransford, told witness that she wanted her to persuade her husband (Abram) to make a mar-

riage contract,—that there was a paper, but it did not amount to a marriage contract.

"The defendant then introduced as a witness Sally Bransford, who testified, that she was the wife of the defendant's son, and had lived in the defendant's house for about two years prior to his wife's death; that she never saw any unkindness between them; that Mrs. Bransford, the day she went to Vanhook's to make her will, came into her room, and told her that she was going to see Mrs. Pritchett, who was very sick; that Mrs. Pritchett's husband came for her; that, when she returned the next day, she said Mrs. Pritchett was much better and had been able to get up to breakfast. This witness said, that she heard Mrs. Bransford, some six or eight weeks before her death, say that she had made no marriage contract with her husband when she married, and that she did not think it right to do so, as it had a tendency to interrupt the harmony of families; that this conversation took place in the presence of witness and a Miss Harrold, a half-sister of witness; that the deceased made the remark in reply to Miss Harrold, who told her of the marriage of some young lady who had made a marriage contract; that the conversation occurred in witness' chamber, at Abram Bransford's residence; that Miss Harrold and the deceased were sitting up with her child, who was sick. To show that this witness had made different statements about this conversation, and to discredit her, the plaintiff read her two depositions taken in this cause", in which she gave the following accounts of it: "Said Elizabeth told me, some short time before her death, some seven or eight weeks, that there had never been a marriage contract between her and her husband,—that she believed such a thing had a tendency to create bad feelings. This conversation took place in the company of several persons, and originated in this way : One of the company mentioned a young lady getting married and making a marriage contract; when Mrs. Bransford replied, that she did not think it right, that she did not make one when she married Mr. Bransford, and that she thought it made interruptions between man and wife." "The conversation alluded to took place at the house of Mrs. Bransford, where I was at that time living as a member of the family, some time in June or

July, 1851. Those present at the time were, old Mrs. Brans-
ford, deponent, and a half-sister of deponent's by the name of
Ann Harrold."

The defendant then read to the court the written notice,
which the proponent had served on him, to produce on the
trial the marriage contract between himself and his wife, and
produced the paper above set out as "Exhibit A" to Hurt's
deposition. The body of the instrument, and the signature,
were proved to be in the defendant's handwriting, and the
endorsement on it to be in the handwriting of said Ayres,
who was proved to have died in 1837. He also introduced
as witnesses Samuel Cruse, Geo. P. Beirne and John J. Cole-
man, for the purpose of proving by them, as experts, that the
writing was as old as it purported to be; and the court ad-
mitted their evidence, against the proponent's objection. On
this evidence, the defendant offered to read the instrument,
as original evidence, and as responsive to the notice. The
proponent objected to its introduction, on the ground that its
execution and authenticity were not sufficiently established,
that it was not the contract called for by him in said notice,
and because he had not called for it at the trial in pursuance
of said notice. The court allowed it to be read as evidence,
and the proponent excepted.

The proponent propounded interrogatories under the
statute to the contestant, but declined to read his answers
thereto on the trial. The defendant offered to read the first
and third interrogatories, his answers thereto, and the *jurat;*
"and stated, that he did not offer them as evidence of the
facts stated in said answers, but merely to show that he had
made such answers at that time, to be considered by the
court, in connection with the testimony of John H. Hurt, as
to defendant's declaration that he had burnt the marriage
contract." The plaintiff objected to this; but the court over-
ruled his objection, and he excepted.

"This was all the evidence in the cause; upon which the
court dismissed the proponent's petition, and refused to admit
the will to probate." The proponent excepted to this ruling
of the court, and now assigns it for error, together with the
rulings on the evidence above stated.

ROBINSON & JONES, for the appellant, contended,—

1. That the evidence establishes the fact that there was a marriage contract; and a married woman, possessed of a separate estate, may bequeath it, without or against her husband's consent.—Fettiplace v. Gorges, 1 Vesey, jr., 46; Burton v. Holly, 18 Ala. 408.

2. That the paper produced by the defendant below was not the marriage contract to which the witnesses deposed; but, even under it, the wife took a separate estate. By its terms, the husband took an estate for the life of the wife, while the remainder in the property was reserved to the wife's children. He therefore held the remainder, not as husband, but rather as a trustee for such children as might be born to the wife.—3 Stew. 172, 375; 9 Port. 636; 4 Stew. & P. 286; 20 Ala. 338; 11 ib. 207; 4 ib. 350.

3. That the wife had a right to make a will, whether she had a separate estate or not; because the English law, which held her intestable solely on account of her husband's right, was not of force in Alabama.—Vanderveer v. Alston, 16 Ala. 494; Randall v. Shrader, 17 ib. 333; 2 Bla. Com. 498; 1 Wms. on Executors, 42; Roper on Husband and Wife, 170; Osgood v. Breed, 12 Mass. 525; Burton v. Holly, 18 Ala. 408.

4. The litigation as to the marriage contract is not conclusive, and ought not to be allowed in the probate court. In England, a *prima facie* showing only was required.—1 Phill. 352; 3 Add. 235.

5. The court erred in permitting the contestant to use his answers to the interrogatories for any purpose.—Branch Bank v. Parker, 5 Ala. 731; Roberts v. Trawick, 22 ib. 491.

S. D. CABANISS and J. W. CLAY, *contra*, submitted written arguments, in which they made the following points :

1. A married woman, at common law, was utterly incapable of making a will or testament, without the consent of her husband; and the only exceptions to the general rule were, a testamentary appointment under a power, properly executed, and a bequest of her separate estate.—1 Williams on Executors, 45-51; 1 Lomax on Executors, 11; 2 Bright on Husband and Wife, 39; 2 East, 555; 1 Vesey, jr., 48; 2 Eng. Ch. R.

26; 4 Man. & Gr. 1076; 3 Cro. Car. 106; 4 Viner's Abr. 164; Sheppard's Touchstone, 402; 2 Wooddeson's Lectures, 459; 2 Coke's R. (pt. 4) 61. But a general assent by the husband, that the wife may make a will, is not sufficient; it must be shown that he assented to the particular will made by her.—2 Bla. Com. 498; 2 Str. 891, 1111, 1118.

2. To entitle the will of a married woman to be admitted to probate, it must be proved to be within one of the exceptions to the general rule; and, in this case, since the husband's consent was expressly disproved, it must be proved that the property embraced in the will was the separate estate of the wife. The only evidence adduced of this fact consisted of the loose and inconsistent statements of two witnesses ,who were ignorant of all the legal rules for the construction of writings, who had not for many years seen the paper of which they spoke, did not agree as to its contents, and could not recollect all its provisions. Such evidence is entirely too indefinite, uncertain and unsatisfactory to establish the terms of a written contract, which no lawyer would undertake to construe without having it before him.— Mitchell v. Gates, 23 Ala. 438; 9 Wheat. 597; 1 Peters, 600; 2 Mason, 468.

3. The probate court was not limited in its inquiry to the *factum* of the will, but might well examine and determine whether the testatrix had any property which could pass under it.—Osgood v. Breed, 12 Mass. 533; Yates v. Will, 2 Dana, 215, cited with approbation in 18 Ala. 426; Holman v. Perry, 4 Metcalf, 492; Mullins v. Lyles, 1 Swan, 337; Brook v. Turner, 1 Modern, 211. In England, the proponent of a will, which professed to be made in execution of a power, was not held to strict proof of the execution of the power, because chancery was the proper forum for the determination of that question; and in cases of that character, the probate of the will, so far as the validity of the appointment was concerned, was not conclusive on the rights of the parties contesting it. But the organization and powers of our probate courts are different from those of the ecclesiastical courts in England, from whose sentences there was no appeal; and there seems no good reason why they may not finally adjudicate questions as to proper execution of such

powers.—Goldsworthy v. Crossley, 4 Hare, 145; Barrs v. Jackson, 1 Phil. 584. The probate of the will of a married woman, on notice to the husband, on the ground that the wife had a separate estate in the property, or that she was licensed by her husband to dispose of it, would be conclusive on him, in a subsequent suit for the property.—1 Salk. 291; 1 Phil. (19 Eng. Ch.) 584.

4. The genuineness and antiquity of the instrument produced by the defendant are clearly shown; and it is, doubtless, the marriage contract to which the witnesses depose.

5. The defendant's answers to the interrogatories were not offered as evidence, but might well be considered by the court for the purpose specified.

RICE, C. J.—It is well settled, that where there is an agreement between husband and wife, before marriage, that she shall have to her separate use either the whole or particular parts of her personal property, she may dispose of it by her will, without the consent of her husband.—2 Bright on Husband and Wife, 66, 120; Peacock v. Monk, 2 Vesey, sr., 191; Fettiplace v. Gorges, 1 Vesey, jr., 46; Rich v. Cockell, 9 Vesey, 369; Newlin v. Freeman, 1 Iredell's Law Rep. 514. See, also, Burton v. Holly, 18 Ala. Rep. 408, in connection with Scammell v. Wilkinson, 2 East's Rep. 552.

The legal evidence in the cause, under an application of the rules provided by law for ascertaining its weight and effect, convinces us that there was such an agreement between Abram Bransford and his wife Elizabeth before their marriage, in relation to the slave then owned by her; that it was in writing, and signed by both of them, and duly executed before the marriage; and that, after the marriage, he obtained possession of it, and has either destroyed or suppressed it.

Notice to produce it on the trial was given before the trial. He did not produce it, but produced an instrument signed by himself alone, which is proved to be materially different from it. Secondary evidence of its contents was given by two witnesses, Mrs. Lowry and Peter T. Hurt, who had seen it several times, and read it. Both of them testify that, according to their best recollection, it was signed by said Elizabeth and by said Abram. Mrs. Lowry testifies, that she saw it "*before*

*they were married"*; that the girl Louisa, owned by said Elizabeth at that time, was secured by said agreement "to the separate use of said Elizabeth"; and that she does not recollect that any other negro was mentioned in it. Peter T. Hurt testifies, that "he has a distinct recollection of the provisions of said contract, though he does not recollect the words"; "that the said contract related to *the negro property* of said Elizabeth, and reserved the right and title of said property to the said Flizabeth, and the said Bransford gave up whatever title he might have in said property as the husband of the said Elizabeth"; that his best recollection is, that it "reserved the said property to the sole and separate use of the said Elizabeth"; that he has read it "a great many times"; that he does not *know* whether it embraced all the negroes or not, "but his best recollection is *that it embraced all.*"

If there be any obscurity or uncertainty in the secondary evidence of the contents of the agreement executed by the said Abram and the said Elizabeth, it arises from his suppression or destruction of that agreement. Suppression is tantamount to spoliation, in respect to the presumptions against the party suppressing. And as he is here the contestant, the following maxim applies to him in full force, "*Omnia presumuntur contra spoliatorem.*"—Bowles v. Stewart, 1 Schoales & Lefroy, 209; 2 Phil. on Ev., (edition of 1839,) 293; 3 *ib.* 1192, 1193, 1195, 1216, 1220, 1222, 1224, 1234; Jackson v. McVey, 18 Johns. 330; Life & Fire Ins. Co. v. The Mechanics' Fire Ins. Co., 7 Wend. 31; 1 Starkie on Ev. 34.

The presumptions which the law requires to be made against him, from the evidence adduced by the proponent of the will, are not overturned by any evidence in the present record.

The proponent having declined to offer as evidence the answers of the contestant to the interrogatories propounded to him for discovery under the statute, the court could not, without error, consider or treat any of such answers as evidence for any purpose on the trial. Br. Bk. at Montgomery v. Parker, 5 Ala. Rep. 731.

It is unnecessary now to decide any thing as to the *admissibility* of the instrument signed by the contestant and dated 27th June, 1852, or of the testimony of Samuel Cruse, George

P. Beirne, and John J. Coleman, in relation to that instrument. For, conceding the same to be admissible, it cannot affect the result of the case in this court; and on another trial in the court below, we do not know that the same questions of *admissibility* will be presented in the same shape.

Our opinion is, that, upon the evidence contained in the record, the court below should have admitted the will to probate. For the error is disallowing probate, its decree is reversed; and, under what we deem the safer practice in such cases, the cause is remanded.—Code, § 3034.